889 P.2d 843

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Cesario SANDATE, Defendant–Appellant.**

**No. 15273.**

Court of Appeals of New Mexico.

Oct. 21, 1994.

Tom Udall, Atty. Gen., Shari Weinstein, Sp. Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Sammy J. Quintana, Chief Public Defender, Susan Roth, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

BLACK, Judge.

Defendant appeals from his conviction on one count of criminal sexual contact with a minor. He raises three issues on appeal: 1) whether a videotaped police interview of the alleged victim was properly admitted as a prior consistent statement; 2) whether the district court erred in admitting evidence of uncharged sexual acts between Defendant and others, as well as between Defendant and the alleged victim; and 3) whether it was fundamental error to fail to instruct the jury on the element of unlawfulness. We reverse on issue one, and address issues two and three only as they may arise on retrial.

## I. SUMMARY OF FACTS AND TESTIMONY

On May 15, 1992, Susan sent her six-year-old daughter, Tiffany, to Defendant's trailer to borrow some toenail clippers. When Tiffany was gone fifteen to twenty minutes, Susan began to worry. Upon Tiffany's return home, Susan questioned her at length. After thirty-five to forty minutes of questioning, Tiffany reported that Defendant had licked her "private."

At trial, Defendant objected to a neighbor, Sherry, relating comments made to her by

her daughter, Amanda, about what Tiffany had told Amanda. Sherry was, however, allowed to testify that Amanda told her "something." Sherry further testified that she then told Susan "something" was happening between Defendant and Tiffany. Sherry also testified that she did not trust Defendant because, on a previous occasion, after promising that her son would not be allowed to go swimming, Defendant allowed him to swim in his underwear.

Amanda was twelve years old at the time of trial. Amanda testified that she saw Defendant tickle Tiffany all over, including her private parts. She, too, was allowed to testify that Tiffany had told her about "something" occurring between Tiffany and Defendant. Amanda also testified that she had reported that "something" to her mother. Finding that the probative value of the testimony outweighed its inflammatory effect, the district court allowed Amanda to testify that she told her mother a second time that Tiffany had said "something." Amanda also testified that her memory was better when she gave her statement to the police than it was "today." She was then asked whether the police had inquired if she had seen Defendant touching Tiffany's breasts, and rubbing or touching Tiffany on the vagina. On the witness stand, Amanda was asked, not whether any of this actually had occurred, but rather, whether she remembered being asked about these things by the police. She had some recollection of such questioning.

Susan testified that Tiffany told her Defendant had molested her and her friend, Omi. Susan further testified that Omi told her mother the same story. Defense counsel objected to this testimony as hearsay, and the district court admonished the prosecutor to avoid hearsay. Susan also testified that Tiffany had been sexually molested on several occasions by at least two neighborhood children.

Susan testified that Sherry had reported to her the night before the alleged incident that Amanda had said "something" about Tiffany and Defendant. Susan said she discounted this report as jealousy and allowed Tiffany and her brother to stay overnight at Defendant's that same night. The State then questioned Susan at length as to whether Tiffany had told her about any specific sexual acts performed by Defendant.

On redirect examination, the prosecutor asked Susan whether Tiffany had told her about other prior sexual contact between Defendant and Tiffany. Susan indicated that Tiffany had said nothing at first, but when asked about specific different types of penetration, Tiffany agreed that some had occurred, but not others. The prosecutor then began trying to refresh Susan's recollection with a prior statement she had given to the police the day of the incident.

Tiffany also took the witness stand. When the prosecutor asked her if Defendant ever did anything painful to her, she answered affirmatively. When the prosecutor asked what Defendant had done, she did not answer. The prosecutor continued questioning Tiffany. During a portion of that direct examination, the following exchange occurred:

Q: What happened after you were laying down on the bed?

A: He pulled my panties down.

Q: He pulled your panties down? What happened then?

A: He did "nasties" to me.

Q: You said he did "nasties" to you—can you tell us exactly what it was that he did? [silence]

Q: Did he touch you?

A: Yes.

Q: What did he touch you with?
[silence; prosecutor repeated the question]

A: His "private."

. . . .

Q: Did he touch you with anything else?

A: No.

Q: What did he do with his "private?"

A: He put it in my "private."

Q: Put it in your "private?"

A: Yes

. . . .

Q: How did he put—can you tell us how he did this? Exactly what he did? [silence]

Q: Can you say how long it was? Was it a long time, a short time, what?

A: Short.

Q: You said he was wearing white shorts. And what did he do with the white shorts when he did this? [silence]

Q: Tiffany, do you need a drink of water or something? You want to tell us what happened? [silence]

Q: Can you tell us more about what happened? [silence]

Q: Okay, Tiffany, did he touch you with anything else besides his private parts?

A: No.

Q: Was that the whole time?

A: No.

Q: And when you went to get the clippers?

A: Yes.

Q: What else did he touch you with? [silence]

[Prosecutor reminds her that she said she would tell the truth.]

Q: You'd like to do that [tell the truth]?

A: Yes.

After this exchange, defense counsel asked for a bench conference. He objected to the repeated questions because Tiffany was not answering them. The judge informed the prosecutor that he was not going to allow him to ask totally repetitive questions. When the prosecutor requested a recess, the judge asked if he thought it would do any good, and added that questioning Tiffany was "like pulling teeth."

Later, the judge held another bench conference regarding Tiffany's unwillingness or inability to testify. After much cajoling by the prosecutor proved fruitless, the judge agreed to try questioning her himself. The judge then asked Tiffany the following questions:

Q: Did ... [Defendant] hurt you?

A: Yes.

Q: What?

A: Yes.

Q: He did? Did you tell your mother what happened when you went for the clippers?

A: Yes.

When Tiffany returned after a recess, she said that she told both her mother and the officers the truth. She said she had told the officers things that had happened for a "long time," not just on the morning of May 15, 1992. She said that, in addition to sticking his "private" in her "private," Defendant licked her "private." Tiffany said he had also licked her before May 15, 1992, and had touched her "private" with his hands.

The prosecutor then showed Tiffany Defendant's vibrator, and the following colloquy occurred:

Q: Have you seen [it] before?

A: Yes.

Q: Where did you see it before?

A: At his house.

[discussion to clarify that "his house" refers to Defendant's house]

Q: What would he do with [it]? [silence]

Q: Let me ask you, did he use [it] on himself?

A: Yes.

Q: And what would he do with it when he used it on himself? [silence]

Q: Would he touch himself with it?

A: No.

Q: What did he do with it? [silence]

Q: Would it make a noise when he had it?

A: No.

Q: Did he ever touch you with it?

A: No.

Q: Did you ever tell anybody that he had touched you with it?

A: No.

Q: Have you ever heard it or seen it turned on?

A: Yes.

Q: When was that? Do you remember?

A: For a long time.

Q: What was being done with it while it was turned on? [silence]

Q: Who had it when it was turned on?

A: Him.

Q: What was he doing with it? [silence]

Q: Do you know what he was doing with it? [silence]

Q: Did you see him with it? [silence]

## II. *THE VIDEOTAPED STATEMENT WAS NOT ADMISSIBLE UNDER RULE 801(D)(1)(b)*

Defendant's evidentiary challenges center on the admission of Tiffany's videotaped interview with police the afternoon of the alleged incident. Defendant objected vehemently to the use of the videotape on the ground that it did not fall within the hearsay exception permitted under SCRA 1986, 11–801(D)(1)(b) (Repl.1994). The district court overruled the objection and allowed the videotape to be played during the course of Officer Wilkinson's testimony. On appeal, Defendant contends that the admission of the videotape as a prior consistent statement was error. We agree.

On the videotape, Tiffany responded to questions much more freely than she did on the witness stand. In response to police questioning, Tiffany stated that, after going to his house to get the clippers, Defendant said he wanted to "lick [her] 'private.' " He told her to come into his bedroom and lie down on the bed. Tiffany said Defendant spread her legs "out how far he wanted [her] legs to go, and it hurt [her]." She stated that Defendant licked her "private" and also licked her "butt." On the videotape, Tiffany said that Defendant did not put his "private" in her "private" that morning. She stated that Defendant also made her touch his "private" with her hand. In response to later questions, she further informed the police that he touched her "titties" on "Friday, Monday, and Tuesday" and put his "machine" (vibrator) on her "private."

Relying on *State v. Vigil,* 103 N.M. 583, 711 P.2d 28 (Ct.App.1985), the State urged admission of the videotape as a prior consistent statement under SCRA 11–801(D)(1)(b), which states that a prior consistent statement offered to rebut a charge of recent fabrication or improper influence is not hearsay. Defendant objected that a prior consistent statement was only admissible to rebut charges of recent fabrication, and contended that this fabrication had occurred as a result

of Susan's initial questioning of Tiffany before the police videotape was made. The State did not dispute this contention.

Defendant also complained that the videotape was not a "consistent" statement. The State responded that the videotaped statement was only inconsistent "in part." The district court admitted the videotape as a prior consistent statement, but later agreed that the portion of the videotape discussing incidents with other children and uncharged acts should be redacted.

■ Generally, a videotape made by a witness outside of court, when offered to prove the truth of the matter asserted, constitutes inadmissible hearsay. *Sprynczynatyk v. General Motors Corp.,* 771 F.2d 1112, 1117 (8th Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986). It follows that "[o]ut-of-court testimony, which is usually less reliable than live testimony that is given under oath, in open court, and subject to cross-examination, should not dominate the jury's deliberations simply because a party was clever enough to record that out-of-court testimony on videotape." *Chambers v. State,* 726 P.2d 1269, 1276 (Wyo. 1986).

■ SCRA 11–801(D)(1)(b) is commonly construed to require two conditions before a prior consistent statement may be admitted. *State v. Lucero,* 109 N.M. 298, 302, 784 P.2d 1041, 1045 (Ct.App.1989). First, the prior statement must be consistent with testimony given by the declarant at trial. *Id.* Second, the statement must be admitted to rebut an express or implied charge of recent fabrication or improper influence or motive. *Id.* In addition to the above, some courts have imposed a third requirement that, in order to be admissible, a prior consistent statement must also have been made before the motive to fabricate existed. *Id.; see generally Nitz v. State,* 720 P.2d 55, 64 (Alaska Ct.App.1986) (describing prior consistent statement rule as "commonly construed" to include this third requirement). In *Lucero,* this Court rejected a bright line rule allowing admission of prior consistent statements only if they were made before the supposed motive to fabricate arose. We held that the district court should

examine the circumstances under which the statement was made to determine the statement's relevancy and probativeness to rebut a charge of recent fabrication. *Lucero,* 109 N.M. at 303, 784 P.2d at 1046.

■ The videotaped interview of Tiffany does not meet the first requirement of SCRA 11–801(D)(1)(b). To the extent she testified as to any substantive events at trial, there are several obvious inconsistencies between Tiffany's trial testimony and her videotaped police interview. More importantly, Tiffany did not answer, or answered inconclusively, many of the prosecutor's critical questions at trial. The district judge acknowledged this fact by noting that obtaining answers from Tiffany was "like pulling teeth." The judge even attempted to question Tiffany himself.

■ The issue in this case then becomes whether SCRA 11–801(D)(1)(b), which is, of course, patterned after Federal Rule of Evidence 801 ("Rule 801"), can be used, not to admit a prior consistent statement, but to admit the past recollection of a witness who is available and testifies, but with a poor memory. Although the cases and commentators are divided on this issue, *compare* 1 John W. Strong, *McCormick on Evidence* § 47, at 177–78 & n. 18 (4th ed. 1992) *with* 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 801(d)(1)(B)[01], at 801–192 to 801–195 (1994) (discussing different views), we think the better reasoned position precludes the use of a prior out-of-court statement to fill in the gaps left by the faulty memory of a witness who actually testifies at trial. According to Judge Weinstein and Professor Berger, the Advisory Committee's notes to Rule 801 support that position. They have written:

> The Advisory Committee's notes do not indicate whether the substantive effect of the rule extends to situations where the prior the [sic] consistent statement is admitted not to rebut an inconsistent statement, but to refute an imputation of inaccurate memory on the part of the witness by showing that he made the same statement when the event was recent. However, normal usage would argue that the words "fabrication," "influence" and "motive" indicate that the Rule is intended to

cover only those situations where the witness deliberately changes his story. Therefore, Rule 801(d)(1)(B) should apply only when there is some suggestion, if only slight, that the witness consciously altered his present testimony after making the inconsistent statement by which he has been impeached.

4 Weinstein & Berger, *supra,* ¶ 801(d)(B)[01], at 801–192 to 801–195 (footnotes omitted).

Professor Seidelson reaches the same conclusion by comparing the language of Rule 801(d)(1) with the language of Federal Rule of Evidence 804 ("Rule 804"):

> It seems plain from the language of the rule itself that Congress intended the non-hearsay characterization to apply only where the declarant testifies meaningfully at trial concerning his prior statement. Therefore, Rule 804 and Rule 801(d)(1) deal with two quite different situations— Rule 804 requires unavailability of the declarant as a condition precedent to utilization of the hearsay exceptions set forth therein, whereas Rule 801(d)(1) contemplates meaningful trial testimony by the declarant as a condition precedent to having the categories of declarations set forth therein characterized as non-hearsay.
>
> The inclusion of the phrase "a lack of memory of the subject matter of [the] statement" as a part of the definition of unavailability in Rule 804, and its exclusion from Rule 801(d)(1), seem to imply that the latter rule was intended to require meaningful testimony from the declarant concerning his prior extrajudicial declaration.

David E. Seidelson, *The Confrontation Clause and the Supreme Court: Some Good News and Some Bad News,* 17 Hofstra L.Rev. 51, 94 (1988) (alteration in original) (footnotes omitted).

Our task is to determine the purpose and intent of the rule. *State v. Lucero,* 114 N.M. 460, 462, 840 P.2d 607, 609 (Ct.App.1992). Both the Advisory Committee's notes and Professor Seidelson's comparison of the language of Rule 801 with that employed in Rule 804 convince us that Rule 801(d)(1)(B) was not intended to permit an unexamined

out-of-court statement as a substitute for trial testimony from a witness who cannot remember critical events.

Even some of those who favor employing Rule 801(d)(1)(B) as a vehicle for admitting out-of-court statements of witnesses who testify poorly at trial would tightly limit the practice. For example, Professor Graham offers a hypothetical example where counsel cross-examines a witness on why he can remember the color of the stoplight but little else about the accident scene. Michael H. Graham, *Prior Consistent Statements: Rule 801(d)(1)(B) of the Federal Rules of Evidence, Critique and Proposal*, 30 Hastings L.J. 575, 606–07 n. 102 (1979). As he points out, in this type of situation a prior statement that is consistent with the testimony "would not in any significant respect rebut the cross-examiner's charge of lack of recollection." *Id.* at 607 n. 102. Professor Graham therefore concludes that "[o]nly where the cross-examiner engages in a direct attack upon the witness's ability to recall the particular fact in question, and employs an inconsistent statement or impeaches the witness by negative evidence addressed to that very fact, should a prior consistent statement near the event be admitted to rebut." *Id.*

Here the videotape was used to shore up Tiffany's lack of trial recollection on several key points regarding her encounter with Defendant. Thus, even under Professor Graham's analysis, it is doubtful that the videotape recounting various alleged encounters between Defendant and Tiffany could have been admitted. Because the videotape fails to meet the first requirement of SCRA 11–801(D)(1)(b), we find it unnecessary to examine the second and third requirements of the rule.

█ Even though we held the videotape inadmissible in evidence, this Court must ask whether the admission of Tiffany's videotaped interview was prejudicial to Defendant. We hold that it was. It is far easier to elicit favorable testimony from a child when a detective or other type of skilled questioner leads the child through preconceived scenarios, and without any confrontation or cross-examination, than it is to elicit trial testimony. *Burke v. State*, 820 P.2d 1344, 1348

(Okla.Crim.App.1991), *cert. denied*, 504 U.S. 973, 112 S.Ct. 2940, 119 L.Ed.2d 565 (1992); *accord In re Troy P.*, 114 N.M. 525, 528–29, 842 P.2d 742, 745–46 (Ct.App.1992) (noting that there is a recognized danger of suggestive interviewing procedures in child sexual abuse cases). At trial, there was no medical evidence of sexual contact and virtually no direct testimony, but rather only a profusion of hearsay to support the charges. The admission of an alleged prior consistent statement in such a case constitutes reversible error. *See Pennington v. State*, 24 Ark.App. 70, 749 S.W.2d 680 (1988) (en banc); *Wise v. State*, 546 So.2d 1068 (Fla.Dist.Ct.App.), *review denied*, 554 So.2d 1169 (Fla.1989); *State v. Harper*, 35 Wash.App. 855, 670 P.2d 296, 298–99 (1983), *review denied*, 100 Wash.2d 1035 (1984). On this record, we cannot say that the admission of the videotape was harmless error.

### III. EVIDENCE OF UNCHARGED PRIOR CONDUCT SHOULD NOT HAVE BEEN ADMITTED

We divide this issue into two parts, because the question of whether the district court erred in admitting evidence regarding Defendant's prior acts with the victim and with others relies on two different lines of case law. We turn first to a discussion of preservation.

#### A. *Preservation*

█ The prior act at issue on this appeal is Defendant putting a vibrator on the genitals of Tiffany's friend, Omi. The statement regarding this incident occurs during Tiffany's videotaped interview. The State argues this error was not preserved. We do not agree.

The State argues that Defendant's motion for mistrial was improper because it was not timely and because Defendant refused a limiting instruction. *See State v. Martinez*, 102 N.M. 94, 100, 691 P.2d 887, 893 (Ct.App.) (stating that, where an improper admission of evidence can be cured by a limiting instruction, the proper remedy is to request such an instruction; failure to do so constitutes waiver of error), *cert. denied*, 102 N.M.

88, 691 P.2d 881 (1984); *accord State v. Gonzales,* 113 N.M. 221, 228, 824 P.2d 1023, 1030 (1992). Defense counsel argues that he concluded the limiting instruction would only make things worse. We think this was a legitimate concern. When, as here, a limiting instruction would not cure the error, a party does not waive error by refusing such an instruction. *See Martinez,* 102 N.M. at 100, 691 P.2d at 893. Considering that the State was told by the district court to remove the portion of the videotape dealing with uncharged acts with other children, the State should not subsequently benefit from its failure to follow the court's ruling simply because Defendant tactically tried to provide some damage control. *See State v. Rowell,* 77 N.M. 124, 128–29, 419 P.2d 966, 969–70 (1966).

### B. *Acts with Others*

Defense counsel repeatedly expressed concern that the videotape dealt with Defendant's activities with other children. The district court ruled that the references to sexual acts involving other children should not be shown to the jury. The district court thus required that a five-minute segment of the videotape be redacted before being shown to the jury. This section of the videotape concerned, among other things, alleged sexual activity between Defendant and Omi. However, at the point the State actually started the videotape in front of the jury, Tiffany was saying that Defendant put his "machine" (vibrator) on her "private" and also on Omi's "private."

After the videotape was shown to the jury during Officer Wilkinson's testimony, defense counsel told the judge he would save his motion for mistrial until the conclusion of the officer's testimony. When Officer Wilkinson had finished testifying, defense counsel moved for a mistrial on the basis that sexual acts with someone other than the alleged victim were now before the jury. The district court denied the motion, finding that the act was not particularly similar to the acts charged, and that it was a "slight matter."

The State argues that Defendant was not prejudiced by the admission, because the information had been previously admitted through other witnesses. This is not entirely accurate. Due to defense objections, Sherry and Amanda were allowed only to testify that Tiffany had told Amanda unspecified "somethings" about Defendant. Although Tiffany's mother testified that Tiffany told her Omi was also sexually molested by Defendant, Defendant immediately objected, and the district court admonished the prosecutor to avoid hearsay testimony.

■ Evidence of alleged sexual acts with someone other than the victim of the crime(s) before the jury is generally not admissible. *State v. Lucero,* 114 N.M. 489, 492–93, 840 P.2d 1255, 1258–59 (Ct.App.), *cert. denied,* 114 N.M. 413, 839 P.2d 623 (1992); *State v. Mason,* 79 N.M. 663, 667, 448 P.2d 175, 179 (Ct.App.), *cert. denied,* 79 N.M. 688, 448 P.2d 489 (1968). The basic rationale "for excluding character evidence that only shows a propensity to commit various crimes is that such evidence is not probative of the fact that the defendant acted consistently with his past conduct in committing the acts at issue." *State v. Williams,* 117 N.M. 551, 557, 874 P.2d 12, 18 (1994). Therefore, "[t]estimony which amounts to evidence of a defendant's bad character, or disposition to commit the crime charged, when not offered for a legitimate purpose, is inadmissible and unfairly prejudicial." *State v. Rael,* 117 N.M. 539, 540, 873 P.2d 285, 286 (Ct.App.1994).

■ As the district court implicitly recognized in its ruling, the admission of the uncharged act(s) between Defendant and Omi was error. At the new trial, there should be no admission of uncharged acts between Defendant and other children in contravention of SCRA 1986, 11–404 (Repl.1994).

### C. *Prior Acts with Victim*

Defendant urges this Court to reconsider its holding in *State v. Landers,* 115 N.M. 514, 853 P.2d 1270 (Ct.App.1992), *cert. quashed,* 115 N.M. 535, 854 P.2d 362 (1993), regarding the admissibility of prior uncharged sexual acts with the victim. In *Landers,* we followed long-established New Mexico precedent and held that evidence of a defendant's previous sexual conduct with the victim of a sex crime is admissible where it demon-

strates a lewd and lascivious disposition toward that victim. *Id.* at 519, 853 P.2d at 1275. The rationale . underlying *Landers* may very well require reconsideration. *See Williams,* 117 N.M. at 561–62, 874 P.2d at 22–23 (Montgomery, C.J., specially concurring). We need not reach this issue, however, because the specific evidence complained of was inadmissible on hearsay grounds.

■ The testimony provided by Sherry and Amanda is hearsay and does not fall under any exception to the general exclusion found in SCRA 1986, 11–802 (Repl.1994). The hearsay testimony given by Amanda and Sherry about Tiffany telling them that "something" was occurring between Defendant and Tiffany was prejudicial and had little probative value. Their specific testimony, disallowed by the district court on hearsay grounds, left the jury to imagine what outrageous conduct the "something" that they had testified about could be. It also lacked any indicia of reliability.

The admission of this testimony clearly could have confused the jury. This case was essentially a swearing match between Defendant and Tiffany. The alleged incident that occurred during the nail clipper errand took place on May 15, 1992. During their deliberations, a note was sent to the judge asking, "Please define on or about the 15th. Is it subject to only the 15th[?]." The clear inference is that the jury did not know from which act or acts guilt should be determined. The profusion of implied incidents created more chaos than clarity.

■ The State's questioning of Amanda evoked the most pernicious type of hearsay. Amanda was only asked if she remembered being asked if she saw Defendant touching Tiffany's breasts, or rubbing or touching Tiffany on the vagina. The questions thus focused not on Amanda's first-hand knowledge of events, but upon police suspicions. No direct questions regarding whether the conduct actually occurred were elicited, but the suggestion in the questions is obvious:

> Q. [D]o you remember being asked about whether you had seen the Defendant touching what's called "boobs," Tiffany's "boobs?" Do you remember that?

A. I don't remember being asked that.

Q. Do you remember being asked whether it was a touch, whether it was a rubbing, or just a hug?

A. No.

Q. You don't remember that at all? Do you remember about being asked, "Did he touch her on the vagina?"

A. No.

Q. Do you remember being asked, "Was it rubbing, touching, patting, or what?"

A. A little bit ... not much though.

Q. And your memory was better then than it was today?

A. Yes.

Q. You just don't remember any of those questions?

A. No.

Q. And you don't remember your answers?

A. No.

Such questioning was improper. *See Rowell,* 77 N.M. at 127, 419 P.2d at 969. At least some of the jurors would doubtless assume there was some evidence that Defendant had done all those things, or else the police would not have asked the witness about them. *See id.* "[T]he question is one of prejudice to the defendant arising out of the asking of an improper question for the ostensible purpose of planting ideas or thoughts in the minds of the jury." *Id.; see also State v. Baca,* 111 N.M. 270, 278, 804 P.2d 1089, 1097 (Ct.App.1990) (recognizing that a question can provide probative information about which the witness has no knowledge), *cert. denied,* 111 N.M. 164, 803 P.2d 253 (1991); *State v. Day,* 91 N.M. 570, 572–73, 577 P.2d 878, 880–81 (Ct.App.) (questioning defendant about a "possible federal crime" was improper), *cert. denied,* 91 N.M. 491, 576 P.2d 297 (1978).

■ Furthermore, much of the questioning also crossed the permissible boundaries for prior consistent statements. In order to refresh her recollection, Susan eventually referred to her previous statement to police. After reviewing that statement, Susan recalled asking Tiffany specific questions as to whether or not a certain sexual activity had

occurred between Tiffany and Defendant. She asked Tiffany about different types of penetration and stated that Tiffany agreed that they had happened. At another bench conference, the judge agreed to permit this line of questioning because, as the prosecutor argued, during cross-examination of Susan and Tiffany, the inference "has been ... that this witness coached her." The judge disagreed with defense counsel's assertions that these questions ("Did these things occur?" and "Did she tell you these things?") were being offered for the truth of what Tiffany had said.

Once again, this was not a proper use of a prior consistent statement because Susan's statement to the police was merely a reiteration of Tiffany's yes-or-no responses to Susan's earlier leading questions, and Susan repeating Tiffany's responses to police does not refute the claim that Susan "coaxed" the original charges from Tiffany. *Cf. State v. Sanchez,* 95 N.M. 27, 28, 618 P.2d 371, 372 (Ct.App.1980) (noting that it is improper to present an entire criminal charge through leading questions that can be answered "yes" or "no"), *overruled on other grounds by Buzbee v. Donnelly,* 96 N.M. 692, 701, 634 P.2d 1244, 1253 (1981).

■ Finally, this Court must ask whether the "evidence of guilt was so overwhelming that there is no reasonable probability that the improperly admitted evidence contributed to the conviction." *See State v. Gonzales,* 93 N.M. 445, 446, 601 P.2d 78, 79 (Ct.App. 1979). In this case, we must hold that it was not.

## IV. *FAILURE TO INSTRUCT THE JURY ON THE ELEMENT OF UNLAWFULNESS WAS NOT FUNDAMENTAL ERROR*

■ Defendant finally argues that the district court erred in failing to instruct the jury that the "touching" at issue had to be unlawful. Defendant failed to request such an instruction at trial and failed to object to its absence, so the remaining question is whether the failure to include the instruction was fundamental error. *See State v. Osborne,* 111 N.M. 654, 662, 808 P.2d 624, 632 (1991).

At trial, Defendant denied that the incident in question ever occurred. The jury instruction indicated that one element of the crime of criminal sexual contact of a minor is that "[t]he defendant touched or applied force to the vagina of Tiffany[.]" Although the element of unlawfulness was not included in this instruction, that element is not at issue here. Either Defendant performed the act or he did not, and there is no situation where Defendant placing his tongue on or around Tiffany's vagina could be considered lawful. *See State v. Orosco,* 113 N.M. 780, 783–84, 833 P.2d 1146, 1149–50 (1992); *State v. Landers,* 115 N.M. 514, 516, 853 P.2d 1270, 1272 (Ct.App.1992), *cert. quashed,* 115 N.M. 535, 854 P.2d 362 (1993). Therefore, we hold that the omission was not fundamental error.

We affirm the district court on this issue.

## V. *CONCLUSION*

Given Tiffany's lack of memory and somewhat confusing account of the alleged events at trial, we believe that the videotape likely affected the outcome of the trial. The videotape was not admissible as a prior consistent statement. We also hold that it was error to allow the jury to view the portion of the videotape revealing allegations that Defendant participated in the uncharged criminal sexual contact of Omi and to listen to questioning about prior police interrogation of the witnesses rather than the witnesses' actual knowledge of events. We reverse Defendant's conviction and remand for a new trial consistent with this opinion.

IT IS SO ORDERED.

MINZNER, C.J., and BIVINS, J., concur.