1997-NMSC-044

945 P.2d 996

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Dean SALAZAR, Defendant–Appellant.**

No. 22891.

Supreme Court of New Mexico.

Sept. 3, 1997.

Rita LaLumia, Santa Fe, for Petitioner.

Tom Udall, Attorney General, Bill Primm, Assistant Attorney General, Santa Fe, for Respondent.

## OPINION

BACA, Justice.

1. Pursuant to Rule 12–102 NMRA 1997, the Defendant–Appellant Dean Salazar ("Defendant") seeks review of a jury verdict convicting him of first degree murder, shooting into an occupied vehicle, and felon in possession of a firearm. He was sentenced to life imprisonment plus ten and one half years. The Defendant died in prison while the ap-

peal of his conviction was pending before this Court.

2. As a threshold matter, we consider whether the Defendant's death requires abatement of all proceedings had in this prosecution from its inception ("*ab initio*"). Assuming no abatement is required, we are asked to examine whether the trial court correctly instructed on jury unanimity requirements and lesser included offenses. Last, we consider whether the trial court's evidentiary rulings violated the Defendant's rights.

3. This Court declines to abate this case *ab initio*, upholding the conviction and concluding that no error occurred warranting relief.

### I.

4. In the early morning of November 20, 1994, the Defendant shot and killed Josephine Manzanares ("Manzanares") while she was driving on Llano Road in Santa Cruz, New Mexico. Prior to her death, Manzanares had been involved in a relationship with the Defendant for approximately eight years. The relationship was a troubled one, characterized by hostility and allegations of drug abuse. Manzanares and the Defendant had two children together, Willy and Anthony, who were four and five years old, respectively, at the time of the shooting. The children lived with Manzanares and her parents, and the Defendant's access to the children often had been an issue of contention in the relationship.

5. The defense and prosecution presented very different versions of the facts surrounding the shooting. The Defendant testified at trial and alleged the following facts. After the Defendant spent the night of November 19, 1994, consuming alcohol and drugs, he encountered Manzanares on Llano Road on the morning of November 20th. A dispute occurred between them regarding drugs, their relationship, and the Defendant's access to the children. After the dispute, Manzanares left the area in her car, driving down Llano Road. The Defendant followed in another vehicle. The two cars eventually were side by side, driving on Llano Road. Manza-

nares yelled, waved her hands at the Defendant, and veered her car at his vehicle several times. Then, Manzanares leaned over while driving as if she was reaching for something. The Defendant believed that she was reaching for a gun, and he responded by grabbing a pistol that he had with him in the car. He then held it out the window to show Manzanares the weapon so that she would "back off." At that point, the Defendant's weapon accidentally discharged, shooting Manzanares in the neck and killing her.

6. The Defendant also alleged that he did not realize that the bullet had hit Manzanares or that his sons, Willy and Anthony, as well as Manzanares' five-year-old nephew, Eddie, were in her car at the time. After the gun discharged, Manzanares' car went to the side of the road, but the Defendant did not stop because he was afraid Manzanares or her family would call the police. As a convicted felon, the Defendant knew that he was not permitted to possess a gun. Instead, the Defendant went to his brother's house where he was later apprehended by police.

7. The State presented evidence suggesting a different series of events than that offered by the Defendant. Anthony, the Defendant's son, testified that he was a passenger in Manzanares' car at the time of the incident. He stated that the Defendant followed Manzanares' vehicle down Llano, and although Manzanares attempted to drive fast, a truck in the road forced her to slow her car. Anthony further testified that during the pursuit, he raised his hand to wave at the Defendant and the Defendant waved back to him. Anthony concluded by testifying that the Defendant pulled alongside Manzanares' car and "point[ed] the gun to my mom and shot her through the neck."

8. Eddie, who was also a passenger in Manzanares' car, testified that Manzanares had refused to talk to the Defendant and drove away with Eddie and the other boys in her car. Eddie did not see Manzanares with a gun, and he stated that she did not veer her car at the Defendant's vehicle as she drove away. He also testified that the Defendant shot Manzanares and then left the scene.

9. After the incident, Manzanares' car hit a wall near the home of Fidencio Trujillo. Trujillo testified that when he went to the crash scene, the boys said, "My dad shot my mom." Similarly, one of the children later told a police officer on the scene, "My daddy shot my mom." When asked who his father was, the child responded "Dean Salazar." Later that same day, Sgt. Branch of the Española Police Department spoke with the Defendant's son, Anthony, and Manzanares' nephew, Eddie. Branch videotaped these interviews with the two boys in which he asked them several questions regarding the day's events and the role of the Defendant.

10. The Defendant was unconscious and unresponsive when he was located by the Espannola Police Department and taken into custody. He was admitted to Espan☐nola Hospital for treatment of a drug-induced coma. The morning following the arrest, Sgt. Branch went to the hospital, met with the Defendant, and advised him of his *Miranda* rights. The Defendant invoked his right to counsel. Branch left the room, but Branch testified that the Defendant called him back later because the Defendant wanted to "tell his side of the story." Branch stated that he then re-Mirandized the Defendant before proceeding with questions. During this questioning, the Defendant made incriminating statements involving the shooting of Manzanares.

11. Branch recorded this second encounter, but it is unclear whether the entire interview was captured on tape. The Defendant alleges that Branch failed to inform him of his right to remain silent, and the tape does not include the issuance of that warning. However, Branch testified that he gave that particular warning before turning on the tape recorder. Branch did not obtain an express waiver of the Defendant's Fifth or Sixth Amendment rights, either verbally or on a pre-printed Waiver of Rights form.

12. Even if adequate warnings were given, the Defendant contends that the drugs he took made it impossible for him to knowingly, intelligently, or voluntarily waive his rights. Conflicting expert testimony was given as to the Defendant's level of intoxication while in the hospital and the effect of the drugs on

the Defendant's capacity to waive his rights. The trial court found that the Defendant's statements were made after advice of rights, and with a knowing, intelligent, and voluntary waiver of those rights.

13. Also during trial, the State re-called Branch to the stand for the purpose of offering into evidence the videotapes of the boys' interviews from the day of the shooting. Over the Defendant's hearsay objection, the State argued that the tapes were admissible to rebut a defense suggestion of recent fabrication or improper motive or influence over the children by the family of Manzanares. The trial court admitted the videotapes and played them for the jury at trial.

14. At the trial's conclusion, the judge instructed the jury on two theories of first degree murder: deliberate murder and depraved mind murder. The defense requested jury instructions for involuntary and voluntary manslaughter. The judge refused to give the requested instructions. During deliberations, the jury asked the judge whether unanimity was required as to a theory of first degree murder. He answered that the jury need only be unanimous as to a verdict for first degree murder.

15. The jury convicted the Defendant of first degree murder using a general verdict form which did not indicate whether deliberate murder or depraved mind murder was the underlying theory of conviction. The jury also convicted the Defendant of shooting into an occupied vehicle and felon in possession of a firearm under NMSA 1978, Section 30–3–8(B) (1993) and Section 30–7–16 (1987). He was acquitted on three counts of child abuse. This appeal of the first degree murder conviction followed.

16. Subsequently, on or about February 7, 1997, the Defendant died in prison while this appeal was pending. The Defendant's family decided not to move this Court for substitution of the Defendant under Rule 12–301(A) NMRA 1997. The Defendant's counsel has since moved for abatement of all proceedings had in this prosecution from its inception.

17. We review five issues on appeal: (1) whether the Defendant's death while his appeal was pending requires abatement of criminal proceedings in this case to their inception, (2) whether the trial court erred in instructing the jury that it need not be unanimous on one theory of first degree murder where alternative theories of first degree murder were submitted to the jury; (3) whether it was error for the court to refuse to give jury instructions on voluntary and involuntary manslaughter; (4) whether the trial court erred in not suppressing the Defendant's post-arrest statements; and (5) whether it was error to admit videotaped statements of the children at trial.

18. First, we hold that abatement *ab initio* is not required in this case. Second, we affirm the jury's verdict, concluding that there is no requirement of jury unanimity on a single theory of first degree murder where alternative theories of first degree murder are submitted and where substantial evidence exists in the record supporting at least one of the theories presented. Finally, we find that the trial court's jury instructions and evidentiary rulings did not constitute error warranting reversal.

## II.

19. As a threshold matter, we first address whether the Defendant's death in prison requires abatement of all proceedings in this case *ab initio*. We hold that it does not.

20. The abatement issue has been handled differently by various jurisdictions, but the majority rule is that the prosecution abates from the inception of the case upon death of a criminal defendant. *See, e.g., Jackson v. State*, 559 So.2d 320, 321 (Fla. Dist.Ct.App.1990); *Gollott v. State*, 646 So.2d 1297, 1299 (Miss.1994); *People v. Matteson*, 75 N.Y.2d 745, 551 N.Y.S.2d 890, 891, 551 N.E.2d 91, 92 (1989).[1] This is also the current rule under existing New Mexico law. *State v. Doak*, 89 N.M. 532, 533, 554 P.2d 993, 994 (Ct.App.1976).

---

1. For a complete list of jurisdictions following the abatement *ab initio* rule, see Tim A. Thomas, Annotation, *Abatement of State Criminal Case by* *Accused's Death Pending Appeal of Conviction,* 80 A.L.R.4th 189, 191 (1990).

21. However, several jurisdictions have adopted substantial changes to this rule or have abandoned it altogether. *See, e.g., State v. Jones,* 220 Kan. 136, 551 P.2d 801, 803–04 (1976) (recognizing that the death of a defendant during pendency of an appeal does not abate the case from the beginning and that the appeal may be prosecuted notwithstanding death); *Jones v. State,* 302 Md. 153, 486 A.2d 184, 187 (1985) (limiting abatement *ab initio* to cases where a statutory right to appeal has not been exercised or is pending); *People v. Peters,* 449 Mich. 515, 537 N.W.2d 160, 164 (1995) (holding that an order of restitution could be enforced notwithstanding defendant's death pending appeal); *Garcia v. State,* 840 S.W.2d 957, 958 (Tex.Crim.App. 1992) (holding that the death of appellant during pendency of discretionary review resulted in abatement of the appeal but not in abatement from inception of the proceedings). A more recent trend offers courts options in deciding how an appeal should be handled upon the death of an appellant. *See, e.g., State v. McGettrick,* 31 Ohio St.3d 138, 509 N.E.2d 378, 381–82 (1987); *State v. Makaila,* 79 Hawai'i 40, 897 P.2d 967, 972 (1995).

22. In *McGettrick,* the defendant was convicted of bribery, but died while his appeal was pending. *McGettrick,* 509 N.E.2d at 380. Defense counsel subsequently sought to have the entire proceeding abated *ab initio. Id.* The court eventually held that abatement of all proceedings was not required. *Id.* In doing so, it invoked the state's appellate procedure rule governing the substitution of a party. *Id.* at 381. The court reasoned that under certain circumstances, the rule permitted defendant's personal representative or the State to move for substitution. *Id.* Under such a motion, "proceedings [could] then be had as the court of appeals directs." *Id.* at 381–82. According to the court, such action could involve substituting any proper party for the decedent, including his attorney of record. *Id.* at 382.

23. The Supreme Court of Hawaii followed suit in *State v. Makaila,* 897 P.2d at 972. In *Makaila,* the defendant was convicted of murder but died of cancer during the pendency of his appeal. *Id.* at 968. In refusing to strictly apply the abatement *ab initio* rule, the court cited *McGettrick* and the similarity of the Ohio and Hawaii rules governing substitution of parties. *Id.* at 970. The court held that any appropriate party, including the State, could move for substitution of the decedent. *Id.* at 972. However, where no such motion was made, the appellate court, in its discretion, either could abate the case to its inception or enter such other order as the appellate court deemed appropriate under its rules. *Id.*

24. Like the *McGettrick* and *Makaila* courts, we reject a strict application of the abatement *ab initio* rule. New Mexico's rule of appellate procedure addressing the death and substitution of parties is very similar to, if not identical with, its counterparts in Ohio and Hawaii. The New Mexico Rule states in relevant part:

> If a party dies after notice of appeal is filed or while a proceeding is otherwise pending, the personal representative of the deceased party may be substituted as a party on motion filed in the appellate court by the representative or **any other party**.... If the deceased party has no representative, **any party may suggest death on the record and proceedings shall then be had as the appellate court directs**....

Rule 12–301 NMRA 1997 (emphasis added). The language of the rule clearly permits the personal representative or "any other party" to seek substitution of the deceased. As with the earlier cited cases, we conclude that this language permits the deceased's representative or the State to seek substitution.

25. Furthermore, the language "as the appellate court directs" gives the court substantial discretion in determining how such a substitution should be conducted after death has been noted on the record. We hold that this broad language permits the appellate court, on its own initiative, to appoint a substitute for a deceased party-defendant. Such court action is warranted where (1) the remaining parties have not tendered a motion for substitution, (2) where the court determines that continuing the appeal will not prejudice the rights or interests of the deceased, and (3) where concluding the ap-

peal would be in the best interests of the decedent's estate, the remaining parties, or society. Allowing courts to make substitutions on their own initiative is necessary for the effective exercise of discretion in these instances. Without such power, exercise of the court's discretion would hinge entirely on the motions of the parties, and we do not read such a limitation in the language of New Mexico's rules.

26. Permitting the court, in its sound discretion, to continue an appeal in certain circumstances provides for more complete consideration of the interests involved than a strict application of the abatement rule would allow. *See, e.g., Jones,* 551 P.2d at 804 (concluding that the interests of the family of the defendant and the public in a final determination of a criminal case, as well as the possibility that collateral rights might be affected by the criminal proceeding, warrant permitting the appeal to continue despite the death of the defendant); *Gollott,* 646 So.2d at 1304 ("Leaving convictions intact without review by this Court potentially leaves errors uncorrected which will ultimately work to the detriment of our justice system."); *Commonwealth v. Walker,* 447 Pa. 146, 288 A.2d 741, 742 (1972) (rejecting both a motion for abatement *ab initio* and a motion to dismiss the appeal, concluding that it is in the interests of society and the estate of the defendant that any challenge initiated against the propriety or constitutionality of a criminal proceeding be fully reviewed); *State v. McDonald,* 144 Wis.2d 531, 424 N.W.2d 411, 413–14 (1988) (allowing an appeal to proceed and recognizing that because collateral proceedings could be affected by the outcome in a criminal case, it is in the interests of society to have a complete review of the merits; also recognizing that a criminal defendant's right to direct appeal is an integral part of a final determination of the merits and serves as a safeguard to protect the defendant against errors).

27. In this case, we permit the appeal to move forward and appoint defense counsel of record as the Defendant's substitute for the remainder of the proceeding. First, no prejudice is suffered by the deceased or his interests in allowing the appeal

to continue. Before his death, all issues in this case were fully briefed, argued, and submitted to this Court. The Defendant had an opportunity to participate fully in his appeal. Nothing in the record indicates that the issues, as presented, misrepresent the appellate aims or positions of the Defendant. Second, the final decision in this appeal had been drafted and the filing of the opinion was imminent at the time of the Defendant's death. The Defendant's death during pendency of the appeal had no effect on this Court's handling of the issues. Third, concluding this appeal would be in the best interests of society. The opinion in this case clarifies important issues involving the law of first degree murder in New Mexico. Also, substantial collateral rights might be affected by the conclusion or abatement of this appeal.

28. Hence, we reject the notion that, without a motion for substitution by a defendant's representatives, an appellate court is compelled to abate the entire proceeding upon the death of a defendant. Instead, once death is suggested on the record, the court, in its sound discretion, may consider two courses of action. First, it may allow or provide for substitution of the decedent and permit continuation of the appeal. Second, where no substitution is sought by either the court or the parties, the court shall then abate the entire proceeding *ab initio.*

29. However, where a court elects to abate a case, it cannot do so in piecemeal fashion, permitting a trial court verdict to stand and dismissing or abating only the appeal. In New Mexico, a criminal defendant, like Salazar, who was sentenced to life imprisonment is entitled to a direct appeal as of right under the New Mexico Constitution. NM Const. art. VI, § 2. This right is best vindicated by permitting the courts either (1) to continue the appeal where a party moves for substitution or where the court deems that the interests involved warrant completion of the review, or (2) to completely abate the proceedings to their inception.

30. This holding applies only to cases involving the death of a defendant who possesses a direct appeal as of right to a

criminal conviction. It does not apply to defendants who die during pendency of discretionary post-conviction remedies; where a defendant dies pending such discretionary actions, the petition will be dismissed as moot, and the verdict will stand. *See, e.g., Dove v. United States,* 423 U.S. 325, 96 S.Ct. 579, 46 L.Ed.2d 531 (1976).

31. As noted earlier, the New Mexico Court of Appeals in *Doak,* 89 N.M. at 533, 554 P.2d at 994, adopted a strict application of the abatement *ab initio* rule. We recognize the policy concerns articulated in *Doak* but do not find that the rights and interests involved in cases of this nature are best vindicated through rigid application of the abatement *ab initio* rule. Thus, we hold that New Mexico is not bound by strict application of the rule, and to the extent that *Doak* conflicts with our above analysis, it is hereby overruled.

## III.

32. In this case, the State tried the Defendant on dual theories of first degree murder: deliberate murder and depraved mind murder. The jury returned a general verdict of guilty of first degree murder. We hold that the trial court correctly instructed the jury that unanimity is not required as to one theory of first degree murder where alternative theories are presented to the jury, and furthermore, a jury's general verdict will not be disturbed in such a case where substantial evidence exists in the record supporting at least one of the theories of the crime presented to the jury.

## A.

33. The Defendant contends that various provisions of New Mexico uniform jury instructions and judicial rules require that the jury be unanimous on one of the alternative murder theories presented. We disagree.

■ 34. The Defendant correctly asserts that several New Mexico uniform jury instructions and judicial rules refer to jury unanimity. However, these provisions give little guidance to the question of whether all jurors must agree on one theory of murder. The rules and instructions either refer gener-

ally to a requirement of jury unanimity or require only that the jury agree on a verdict. *See, e.g.,* Rule 5–611(A) NMRA 1997. No provision explicitly or implicitly requires jury unanimity on an underlying theory of murder. Therefore, we are not persuaded by the Defendant's arguments that these provisions require unanimity on either deliberate or depraved mind murder.

■ 35. The Defendant also asserts that alternative theories of first degree murder should be treated like step-down instructions for lesser included offenses. More specifically, the Defendant argues that, the same way a jury is required to consider step-down instructions in sequence and find unanimously as to lesser included offenses, a jury is required to find unanimously as to alternative theories of first degree murder.

36. We disagree with this analysis for two reasons. First, Rule 5–611 NMRA 1997, demands only that the jury be unanimous in order to enter a guilty verdict. The jury is not required to agree unanimously on one alternative theory of that lesser offense. Thus, the ambiguity in this section surrounding the meaning of "unanimous" is similar to that noted in the provisions discussed earlier and provides little guidance here.

37. Second, two alternative theories of first degree murder are very different from a greater offense and its lesser included offense. NMSA 1978, Section 30–2–1(A) (1994), states:

A. A murder in the first degree is the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused:

(1) by any kind of willful, deliberate and premeditated killing;

(2) in the commission of or attempt to commit any felony; or

(3) by any act greatly dangerous to the lives of others, indicating a depraved mind regardless of human life.

Whoever commits murder in the first degree is guilty of a capital felony.

In considering first degree murder, the degree of offense and range of punishments is

the same regardless of the theory. *Id.* It is not critical which of the theories is considered first by the jury. However, there is significant difference when considering lesser included offenses. As one "steps down" from a greater offense to a lesser offense, the degree of offense and punishment is less. There is, therefore, good reason with lesser included offenses to determine at which level of offense the jury has agreed, and we are not persuaded by the Defendant's analogy between first degree murder instructions and step down instructions for lesser included offenses.

## B.

38. The Defendant argues that his conviction violates the New Mexico Constitution's guarantee of due process and that the weight of authority requires that a jury be unanimous on one of the alternative theories of first degree murder presented. We disagree.

39. The New Mexico Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. NM Const. art. II, § 18. Case law clearly demonstrates that a unanimous verdict on the crime charged is required for conviction in a criminal case. *See, e.g., State v. Cavanaugh,* 116 N.M. 826, 831, 867 P.2d 1208, 1213 (Ct.App.1993). However, common law analyses of due process have not required jury unanimity on a particular theory of the crime charged. *See, e.g., Schad v. Arizona,* 501 U.S. 624, 641, 111 S.Ct. 2491, 2502, 115 L.Ed.2d 555 (1991); *State v. James,* 698 P.2d 1161, 1165 (Alaska 1985); *People v. Brown,* 35 Cal.App.4th 708, 41 Cal. Rptr.2d 321, 324 (1995); *State v. Jones,* 257 Kan. 856, 896 P.2d 1077, 1087 (1995); *People v. Sullivan,* 173 N.Y. 122, 65 N.E. 989, 990 (1903); *Wilson v. State,* 737 P.2d 1197, 1204 (Okla.Crim.App.1987).

40. In *Schad,* the defendant was tried on dual theories of first degree murder: felony murder and premeditated intentional murder. *Schad,* 501 U.S. at 629, 111 S.Ct. at 2495. The trial court instructed the jury on both theories and told the jury that it must

be unanimous in its verdict of guilty or not guilty. *Id.* The jury returned a general verdict of guilty of first degree murder, and the defendant appealed, arguing that the trial court erred in not requiring the jury to agree on one theory of first degree murder. *Id.* The Supreme Court upheld the conviction, concluding that the trial court had not violated the defendant's due process rights by not requiring the jury to agree on one theory of first degree murder. *Id.* at 645, 111 S.Ct. at 2504 ("[T]he jury's options in this case did not fall beyond the constitutional bounds of fundamental fairness and rationality.").

41. The Supreme Court reasoned that the two mental states, premeditation and a killing committed during a felony could "reasonably reflect notions of equivalent blameworthiness or culpability." *Id.* at 643, 111 S.Ct. at 2503; *State v. Ortega,* 112 N.M. 554, 578 n. 7, 817 P.2d 1196, 1220 n. 7 (1991) (Justice Baca concurring in part and dissenting in part). The Court also noted the widespread acceptance of the two theories as alternative means of satisfying the *mens rea* element of the single crime of first degree murder. *Schad,* 501 U.S. at 642, 111 S.Ct. at 2502.

42. These rationales also apply to the immediate case. Depraved mind murder involves blameworthiness and culpability comparable to deliberate premeditated murder. *See Ortega,* 112 N.M. at 563, 817 P.2d at 1205 (discussing the required scienter showings for each of the three available first degree murder theories). This conclusion is supported by the Legislature's treatment of depraved mind murder. It is treated and punished in the same manner as deliberate intent and felony murder, and the theories are all recognized as capital offenses and named explicitly as forms of first degree murder. NMSA 1978, § 30–2–1(A) (1994). It would make little sense to insist that somehow depraved mind murder differs significantly in blameworthiness, depravity, or culpability from other theories like deliberate and felony murder with which it is similarly labeled, included, and punished.[2] Thus, as

---

2. Defendant does not raise, and we do not address, whether the Legislature's decision to include depraved mind murder as a form of first degree murder was proper.

with the cases cited earlier involving theories of felony and deliberate murder, there was no requirement that the jurors in this case unanimously agree on one of the alternative theories presented, deliberate or depraved mind murder. Unanimity was only required with regard to the overall charge of first degree murder.

## C.

43. The preceding cases require some showing of substantial evidence supporting the conviction. We held in *State v. Olguin* that due process does not require a general verdict of guilt to be set aside so long as *one of the two* alternative bases for conviction is supported by sufficient evidence. *State v. Olguin*, 1995 NMSC 079, ¶ 2, 120 N.M. 740, 906 P.2d 731; *see also Griffin v. United States*, 502 U.S. 46, 49–51, 112 S.Ct. 466, 469–70, 116 L.Ed.2d 371 (1992) (finding no due process requirement to set aside general guilty verdict where evidence was inadequate to support a conviction as to one of the alternative theories of the crime presented); *Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970).

44. We review the sufficiency of the evidence presented on the first degree murder theories in this case under a substantial evidence standard. *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). Under such a standard, sufficient evidence to uphold a conviction exists where "substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to conviction." *Id.* Also, "a reviewing court must view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict." *Id.* "The fact finder may reject a defendant's version" of the facts. *Id.* "Where a jury verdict in a criminal case is supported by substantial evidence, the verdict will not be disturbed on appeal." *Id.*

45. The State presented substantial evidence at trial on deliberate intent murder and depraved mind murder, therefore satisfying the requirements of *Olguin*. To convict the Defendant on the deliberate intent theory of first degree murder, the State had to prove beyond a reasonable doubt that:

1. The Defendant killed Josephine Manzanares; and

2. The killing was with the deliberate intention to take away the life of Josephine Manzanares.

*See* UJI 14–201 NMRA 1997. To convict the Defendant on the depraved mind theory of first degree murder, the State had to prove beyond a reasonable doubt that:

1. The Defendant shot at Josephine Manzanares;

2. The Defendant's act caused the death of Josephine Manzanares;

3. The act of the Defendant was greatly dangerous to the lives of others, indicating a depraved mind without regard for human life; and

4. The Defendant knew that his act was greatly dangerous to the lives of others.

*See* UJI 14–203 NMRA 1997.

46. Substantial evidence was presented on both of these theories of first degree murder. In addressing the first theory, there was no question as to whether the Defendant shot and killed Manzanares. The only element in contention was whether the Defendant deliberately intended to kill Manzanares. The children's testimony alleging that the Defendant pursued Manzanares, pointed the gun, and fired provides an adequate source of direct evidence that the Defendant acted with deliberation, intending to kill Manzanares. *State v. Hamilton*, 89 N.M. 746, 750–51, 557 P.2d 1095, 1099–1100 (1976) (equating express malice and deliberate intent); *State v. Smith*, 26 N.M. 482, 491–92, 194 P. 869, 873 (1921) (holding that express malice, a concept now incorporated in the "deliberate intention" element of willful and deliberate murder, can be inferred from the evidence presented). In addition, the jury reasonably could have decided that the Defendant's past conflicts with Manzanares provided circumstantial evidence of a motive for intentional killing. The Defendant's contention that the shooting was accidental or that he could not have formed specific intent due to his intake of drugs does not make the

evidence presented against him insufficient. The jury heard evidence regarding the Defendant's version of the facts and was free to reject that testimony. *Sutphin,* 107 N.M. at 131, 753 P.2d at 1319.

■ 47. Similarly, the State also presented substantial evidence supporting a finding of depraved mind murder. Only the third and fourth elements of that crime were at issue in this case, and the State presented evidence that would allow a jury to reasonably arrive at a guilty verdict. The children testified that they had waved at the Defendant and that he waved back during the pursuit, so the jury could reasonably determine that the Defendant knew of the children's presence in the car when he fired into the vehicle. This act was both dangerous to the driver and the passengers since a bullet fired from the Defendant's car could have hit any one of the occupants or could have disabled the car, causing the driver to lose control. Additionally, once the driver had been shot, the children were left in a very dangerous situation since the driver was unable to control the car. Furthermore, at least one other third party driver was on the road at the time of the shooting, and the Defendant also knew that the area was populated. Thus, a jury could have found that he acted with a depraved mind and without regard for human life. *State v. McCrary,* 100 N.M. 671, 673, 675 P.2d 120, 122 (1984) (finding that acts involving extreme risk suggest that defendant knew that his acts were greatly dangerous to the lives of others). Because substantial evidence was presented on both theories of first degree murder presented in this case, the Defendant's conviction presents no conflict with this Court's holding in *Olguin. Olguin,* 1995 NMSC 079, ¶ 2, 120 N.M. 740, 906 P.2d 731.

48. The law in *Olguin* is consistent with the position taken in other jurisdictions on this issue. *See, e.g., State v. Wilson,* 220 Kan. 341, 552 P.2d 931 (1976) (holding that if substantial evidence was presented supporting either theory of first degree murder presented by the State, jury verdict of guilty would not be disturbed), *overruled on other grounds by State v. Quick,* 226 Kan. 308, 597 P.2d 1108 (1979); *State v. Hazelett,* 8 Or.App.

44, 492 P.2d 501, 503 (1972) (requiring that substantial evidence be presented on at least one of the alternative theories of the crime presented). However, many jurisdictions demand a higher evidentiary showing where alternative theories of conviction for the same crime are presented. These jurisdictions hold that substantial evidence must be presented to support a finding of commission of *each* of the alternative bases submitted for the jury's consideration. *James,* 698 P.2d at 1167; *State v. Arnett,* 158 Ariz. 15, 760 P.2d 1064, 1069 (1988). However, even under this more rigorous evidentiary standard, the facts in the current case would not amount to a violation of the Defendant's due process rights. As discussed earlier, substantial evidence was presented at trial as to both deliberate and depraved mind murder. Thus, not only did the State present substantial evidence to meet the *Olguin* standard in New Mexico, but it also presented enough evidence to satisfy the more stringent standard adopted by some jurisdictions.

### IV.

■ 49. The trial court's refusal to instruct the jury on voluntary and involuntary manslaughter did not constitute error warranting relief. The propriety of jury instructions given or denied is a mixed question of law and fact. Mixed questions of law and fact are reviewed de novo. *State v. Attaway,* 117 N.M. 141, 144, 870 P.2d 103, 106 (1994).

■ 50. A defendant is entitled to an instruction on a theory of the case where the evidence supports the theory. *State v. Benavidez,* 94 N.M. 706, 708, 616 P.2d 419, 421 (1980), *overruled on other grounds by Sells v. State,* 98 N.M. 786, 788, 653 P.2d 162, 164 (1982); *State v. Diaz,* 1995 NMCA 066, ¶ 24, 121 N.M. 28, 908 P.2d 258; *State v. Arias,* 115 N.M. 93, 96, 847 P.2d 327, 330 (Ct.App. 1993), *overruled on other grounds by State v. Abeyta,* 1995 NMSC 052, ¶ 21, 120 N.M. 233, 901 P.2d 164. Failure to give an instruction which is warranted by the evidence is not harmless error. *Arias,* 115 N.M. at 97–98, 847 P.2d at 331–32. However, sufficient evidence to sustain a conviction on the charge is generally required before an elements instruction will be required. *Benavidez,* 94

N.M. at 708, 616 P.2d at 421. Furthermore, to receive a jury instruction on a lesser included offense, there must be evidence that the lesser offense is the highest degree of crime committed. *State v. Southerland,* 100 N.M. 591, 596, 673 P.2d 1324, 1329 (Ct.App. 1983), *overruled on other grounds by State v. Orosco,* 113 N.M. 780, 833 P.2d 1146 (1992).

### A.

51. The evidence did not warrant a jury instruction on voluntary manslaughter, and therefore, the trial court did not err by refusing to give such an instruction. The Defendant requested an instruction for voluntary manslaughter under UJI 14–220 NMRA 1997, contending that he was provoked. The instruction points out that provocation is the difference between second degree murder and voluntary manslaughter. *Id.* Sufficient provocation involves "any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror, or other extreme emotions." UJI 14–222 NMRA 1997. However, sufficient provocation does not exist where "an ordinary person would have cooled off before acting." *Id.*

52. The Defendant alleged at trial that Manzanares had threatened him on several occasions and that he had been involved in hostile arguments with Manzanares immediately before the shooting. The Defendant also asserted that while both parties were driving on Llano Road, Manzanares veered her car at him and reached under the seat as if to retrieve a gun. The defense argues that a jury, upon hearing this testimony, could have concluded that Manzanares' actions aroused anger, rage, fear, or terror such that the Defendant temporarily lost self-control and had no time to "cool off" before shooting Manzanares. Defendant argues that it was error for the court not to allow an instruction on voluntary manslaughter.

53. We disagree and conclude that the trial court correctly ruled that the evidence did not warrant such an instruction. Other testimony by the Defendant precludes the possibility that he acted out of provocation and therefore eliminates any reason to instruct on voluntary manslaughter. The Defendant testified that as he waved the gun

out the window, it accidentally discharged. Hence, according to the Defendant's own testimony, the shooting of Manzanares was accidental, not voluntary or intentional. Moreover, at no time during trial did the Defendant testify that he killed Manzanares because she provoked him. As such, the evidence did not support a jury verdict of voluntary manslaughter, and thus, the court's decision refusing the instruction was proper. *State v. Manus,* 93 N.M. 95, 101, 597 P.2d 280, 286 (1979) (holding voluntary manslaughter instruction not required where defendant's testimony is exculpatory and does not indicate provocation or heat of passion). Therefore, we need not address whether a voluntary manslaughter instruction was warranted as the highest degree of crime committed.

### B.

54. The trial court's decision not to give an instruction on involuntary manslaughter did not constitute reversible error. In *State v. Yarborough,* 1996 NMSC 068, ¶ 20, 122 N.M. 596, 930 P.2d 131, this Court held that involuntary manslaughter, whether premised upon a lawful or unlawful act, requires a showing of criminal negligence. In its holding, the Court noted that involuntary manslaughter is the killing of a human being without malice by any of three courses of conduct: 1) the commission of an unlawful act not amounting to a felony; 2) the commission of a lawful act that might produce death, in an unlawful manner; or 3) the commission of a lawful act that might produce death without due caution and circumspection. *Yarborough,* 122 N.M. 596, 930 P.2d 131, 1996 NMSC 068, ¶ 8.

55. In this case, the Defendant requested an instruction on involuntary manslaughter based on a lawful act. Yet, in transporting the gun, the Defendant perpetrated an unlawful act. *See* NMSA 1978, Section 30–7–16(A) (1987) (proscribing transportation or possession of gun by a convicted felon and making such an act a fourth degree felony). Further, in waving the gun at Manzanares through the window of a moving vehicle, the Defendant arguably was in viola-

tion of NMSA 1978, Section 30–7–4(A)(3) (1993), endangering the safety of another by handling a firearm in a negligent manner. Finally, if the Defendant intentionally shot at the vehicle, he was guilty of a third degree felony. *See* NMSA 1978, § 30–3–8(B) (1993). On this basis, the Defendant was not entitled to an instruction on involuntary manslaughter premised upon a lawful act.

■ 56. The Defendant also requested an instruction on involuntary manslaughter committed by an unlawful act not amounting to a felony. However, in the Defendant's requested instruction, he asked the jury to find involuntary manslaughter if it determined that the Defendant "shot at Josephine Manzanares." We do not believe that the act described in the instruction, shooting at Manzanares, can be described other than as felonious conduct. Therefore, discharging the gun does not fit the *Yarborough* paradigm of an unlawful act not amounting to a felony.

■ 57. Furthermore, the requested instruction incorrectly characterized the law of involuntary manslaughter premised upon an unlawful act not amounting to a felony. "Shooting at Manzanares" suggests, to a certain degree, an intentional act, and wrongly describes the mens rea associated with involuntary manslaughter. NMSA 1978, § 30–2–3 (1994) (describing manslaughter as the killing of a human being without malice); *State v. King*, 90 N.M. 377, 380, 563 P.2d 1170, 1173 (Ct.App.1977) (stating that the involuntary manslaughter statute excludes all cases of intentional killing), *overruled on other grounds by State v. Reynolds*, 98 N.M. 527, 650 P.2d 811 (1982). It is not error for a trial court to refuse instructions which are inaccurate. *Goodman v. Venable*, 82 N.M. 450, 452, 483 P.2d 505, 507 (Ct.App.1971); *Cf. Gallegos v. State*, 113 N.M. 339, 341, 825 P.2d 1249, 1251 (1992).

58. In sum, the trial court did not err in denying either of the instructions offered on involuntary manslaughter. The court correctly refused the inaccurate instructions tendered by the Defendant. Moreover, the Defendant's act of "shooting at Manzanares" was neither a lawful act, nor was it an unlawful act not amounting to a felony. As such, the evidence on record was insufficient to warrant an involuntary manslaughter instruction. *State v. Taylor*, 107 N.M. 66, 70, 752 P.2d 781, 785 (1988) (holding that the evidence did not support an instruction for involuntary manslaughter in any of the three ways provided for by statute), *overruled on other grounds by Gallegos v. Citizens Insurance Agency*, 108 N.M. 722, 779 P.2d 99 (1989).

## V.

■ 59. The trial court did not err by admitting the Defendant's post-arrest statements into evidence. Whether a confession is voluntary is reviewed de novo upon appeal. *Attaway*, 117 N.M. at 145, 870 P.2d at 107. In reviewing voluntariness, the appropriate standard applicable to coerced confession claims requires that the appellate court examine the entire record and circumstances surrounding the confession. *Aguilar v. State*, 106 N.M. 798, 799, 751 P.2d 178, 179 (1988). Here, the Defendant maintains that he was not properly advised of his rights before being interrogated and that if he waived his rights or if an implied waiver can be interpreted from the facts, the waiver was not knowingly and intelligently given. We disagree, concluding that the trial court properly refused to suppress the Defendant's statements.

■ 60. In *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966), the Supreme Court held that the Fifth and Fourteenth Amendments of the United States Constitution prohibit the use of incriminating statements by an accused following his arrest or being held in custody, unless all interrogation is preceded by advice to the defendant that he has the right to remain silent and to the presence of an attorney furnished free of charge if the defendant cannot afford one. *Miranda* also held that when an accused indicates that he wishes to remain silent, the interrogation must cease; if he requests counsel, questioning must cease until an attorney for the defendant is found and present. *Id.* Statements or admissions elicited contrary to the requirements of *Miranda* are subject to suppression on motion of the defendant. *State v. Boeg-*

*lin,* 100 N.M. 127, 132, 666 P.2d 1274, 1279 (Ct.App.1983).

61. The events surrounding the questioning of the Defendant were probative of the adequacy of warnings given to the Defendant, his level of understanding, and whether the Defendant knowingly, willingly, and intelligently waived his rights under *Miranda.* First, we conclude that the Defendant received adequate notice of rights. Testimony indicates that Branch gave complete *Miranda* warnings to the Defendant. The Defendant argues that because Branch did not read the warnings from a card but instead gave the warnings from memory, there is no conclusive proof that the warnings were complete. However, in addition to Branch's testimony that the warnings were complete, other evidence also indicates that the warnings were complete and understood. In Branch's first encounter with the Defendant, the Defendant immediately invoked his right to counsel upon receiving the *Miranda* warnings from Branch. We believe that this indicates not only that the warnings were given, but also, that the Defendant understood what his rights were and that he did not have to talk to the police if he did not wish to do so. The Defendant had also been convicted on two prior felony charges; his immediate invocation of his right to counsel might be interpreted as an indication of the Defendant's familiarity with his rights and understanding of the process for asserting them.

62. The Defendant made a knowing, wilful, and intelligent waiver of his rights when he elected to speak with the police after his arrest; therefore, the trial court correctly refused to suppress his statements from evidence. Waiver, after invoking the right to counsel, "depends upon the totality of the circumstances and the particular facts, including consideration of the mental and physical condition, background, experience, and conduct of the accused." *Boeglin,* 100 N.M. at 132, 666 P.2d at 1279. The State has the burden of establishing that a defendant waived his constitutional rights and every reasonable presumption against waiver is indulged. *State v. Young,* 117 N.M. 688, 694, 875 P.2d 1119, 1125 (Ct.App.1994). Howev-

er, after a suspect invokes his right to counsel, he may be interrogated if he himself "initiates further communication, exchanges, or conversations with the police." *Id.* (quoting *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981)). When a suspect initiates a conversation with police knowingly and intelligently, his statement may be admitted. *Oregon v. Bradshaw,* 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983).

63. The Defendant initiated the second encounter with Sgt. Branch, waiving his *Miranda* rights knowingly and intelligently. Therefore, his subsequent statements were correctly permitted into evidence at trial. As indicated earlier, after invoking his right to counsel, the Defendant suggested that he wanted to talk to the police again. At that point, Branch had already exited from the Defendant's room, and the Defendant clearly knew that he was under no obligation to speak with the police. However, after the Defendant suggested that he wanted to talk, a hospital worker found Branch, who then entered the Defendant's room for the second time. The Defendant did not object to Branch's return and the subsequent interrogation, even after Branch again told the Defendant of his rights under *Miranda.* Hence, the interrogation was not coercive or violative of the Defendant's rights by virtue of Branch's second visit to the hospital room. The Defendant initiated this encounter.

64. The Defendant argues that if there was a waiver of his *Miranda* rights which could be inferred from his initiation of discussion with the police, that waiver was made unknowingly and unintelligently due to partial incapacitation from his drug-induced coma. However, significant evidence indicated that the level of drugs remaining in the Defendant's bloodstream at the time of interrogation was not so significant as to render the Defendant incapable of fully considering his actions and statements to authorities. *Cf. State v. Setser,* 1997 NMSC 004, 122 N.M. 794, 932 P.2d 484 (1997). Furthermore, the Defendant's actions and statements while in the hospital suggest mastery of his faculties

and an ability to understand and convey events of the previous forty-eight hours. In sum, the facts suggest that the Defendant was informed of his rights, understood those rights, and invoked his right to counsel. However, after some contemplation, the Defendant chose to speak with the police by his own volition, and the trial court correctly refused to suppress those statements.

## VI.

■ 65. The trial court did not err by admitting into evidence the videotaped statements of the boys who were riding in the back of Manzanares' vehicle at the time of the shooting. The videotaped statements were admitted over a hearsay objection by the trial court as prior consistent statements offered to rebut a charge of recent fabrication or improper influence. We review the trial court's admission of this evidence under an abuse of discretion standard. *State v. Bell,* 90 N.M. 134, 138, 560 P.2d 925, 929 (1977).

■ 66. Rule 11–801(D)(1)(b) NMRA 1997 states that a prior consistent statement offered to rebut a charge of recent fabrication or improper influence is not hearsay. Generally, two conditions must be met before a prior consistent statement may be admitted. *State v. Sandate,* 1995 NMCA 017, ¶ 18, 119 N.M. 235, 889 P.2d 843. "First, the prior statement must be consistent with testimony given by the declarant at trial. Second, the statement must be admitted to rebut an express or implied charge of recent fabrication or improper influence or motive." *Id.* In addition to these general requirements, many courts have adopted a third requirement that "a prior consistent statement must also have been made before the motive to fabricate existed." *Id.; see also Tome v. United States,* 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995); *Nitz v. State,* 720 P.2d 55, 64 (Alaska.Ct.App.1986). New Mexico has followed the lead of the Supreme Court, recently adopting this third requirement in *State v. Casaus,* 1996 NMCA 031, ¶ 12, 121 N.M. 481, 913 P.2d 669. We conclude that the videotaped testimony in this instance met these requirements, and its admission was not an abuse of the trial court's discretion.

67. The testimony at trial was consistent with the videotaped testimony of the boys. The Defendant contends that the boys' testimony at trial was characterized by less detailed and less responsive answers than those on the videotape. However, only negligible differences existed between the videotaped interviews and the trial testimony of the boys. There is no allegation by the defense that substantial inconsistencies or changes exist between the live and taped testimonies; the Defendant only claims that the trial testimony was not as complete as the taped version. These minor differences can easily be attributed to the passage of time and the anxiety which often accompanies testifying in court. In sum, the primary inquiry is whether the taped interview and trial testimony were substantially similar as to all material facts presented. We believe that to be the case here.

68. The record indicates that defense counsel implied during trial that the boys recently had altered their testimony due to some improper motive or influence. Citing the *Sandate* case, the Defense contends on appeal that Rule 801(d)(1)(B) is intended to cover only those situations where the witness deliberately changes his story and where the witness has been impeached with a prior inconsistent statement. *Sandate,* 1995 NMCA 017, ¶ 20, 119 N.M. 235, 889 P.2d 843. Under such an interpretation of the rule, according to the Defendant, the taped interviews of the boys are not admissible because the boys were never impeached with a prior inconsistent statement, nor did defense counsel allege that the boys had recently fabricated or consciously changed their stories.

69. However, the issue here does not involve an allegation that a witness is consciously misleading or changing his story, but instead that a young and impressionable witness has been improperly influenced. The record indicates that defense counsel said several times in the opening statement that the boys' feelings about the Defendant had been negatively influenced by their grandparents and possibly by their counselor. Defense counsel also sought testimony on cross-

examination of the boys regarding whether others had told them "bad things" about the Defendant and whether the boys still liked the Defendant. Such tactics by the defense appeared aimed at demonstrating that the boys' trial testimony might have been improperly influenced or colored, even subconsciously, by adults with access to the children during the time prior to trial. We conclude that such a suggestion constitutes an allegation of improper influence which warranted admission of the prior taped testimony.

70. Finally, the videotaped statements were made prior to the existence of a motive to improperly influence the children. The videotaped interviews took place almost immediately after the shooting. Testimony indicates that the children often heard negative comments regarding the Defendant from family members long before the incident. The Defendant contends that the influence exerted over the children predating the shooting precludes admission of the videotaped interviews. We disagree.

71. Any motive to improperly influence the testimony of the children would not have existed until the shooting took place. While negative comments about the Defendant predated the shooting, there would have been no reason or opportunity for the family or counselor to influence testimony regarding the shooting until the incident had actually taken place. No evidence indicates that the children's counselor or grandparents had an opportunity to improperly influence the children between the time of the shooting and the interview. Moreover, no evidence suggests that the children would be motivated to wrongly implicate the Defendant in murder based merely on past negative comments. Hence, the trial court did not err by admitting the videotaped testimony to rebut a suggestion of improper influence.

## VII.

72. The Defendant's appeal should not be abated *ab initio.* We also affirm the conviction, holding that the trial court correctly instructed the jury that unanimity is not required as to one particular theory of first degree murder where alternative theories are presented and substantial evidence exists to support at least one of the theories of the crime. In addition, the trial court did not err by rejecting the jury instructions requested by the Defendant for lesser included offenses. Furthermore, the Defendant is not entitled to relief based upon the trial court's refusal to suppress his post-arrest statements to police. Finally, we conclude that the trial court correctly admitted the videotaped interviews of the children to rebut a suggestion by the defense of improper influence.

73. **IT IS SO ORDERED.**

FRANCHINI, C.J., and MINZNER, SERNA and McKINNON, JJ., concur.

