**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2021-NMCA-049**

**Filing Date: May 5, 2021**

**No. A-1-CA-37715**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JARED YOUNG,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**Steven Blankinship, District Judge**

Released for Publication October 12, 2021.

Hector H. Balderas, Attorney General
Maha Khoury, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Charles D. Agoos, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**YOHALEM, Judge.**

**{1}**     Defendant Jared Young appeals his conviction of second-degree murder, contrary to NMSA 1978, Section 30-2-1(B) (1994). On appeal, Defendant claims that the district court erred in denying his requested jury instruction on involuntary manslaughter, a lesser included offense of second-degree murder. We agree that the district court erred in refusing to instruct the jury on involuntary manslaughter, and we therefore remand for a new trial.

**BACKGROUND**

**{2}**   Defendant's conviction of second-degree murder, contrary to Section 30-2-1(B), arose from the fatal shooting of David Talley (Victim) on December 18, 2016. Defendant did not dispute that he fired the fatal shot at close range. He claimed that he was joking with Victim, never intended to kill him, and pulled the trigger not knowing the gun was loaded.

**{3}**   Defendant and Victim were friends, and Victim was a friend, as well, of Defendant's three roommates, Desiree Guinan, Clay Taylor, and Blayne Rankin (all of whom testified at trial). Defendant and Victim regularly spent time together. The night of the shooting, Victim arrived at Defendant's house shortly after 11:00 p.m. for a planned visit with Defendant. Defendant and two of his roommates, Guinan and Taylor, were home. The third roommate, Rankin, went to work at 5:00 p.m. and had not yet returned home at the time of the incident. The testimony showed that Defendant, Taylor, and Rankin had been using methamphetamine together.

**{4}**   Taylor and Guinan, the two roommates who were home that night, and Defendant were all aware that Victim would be coming over for a visit. Cell phone records at trial showed that Defendant and Victim were texting and calling each other shortly before Victim arrived at Defendant's house. At 11:06 p.m., just minutes before he arrived, Victim sent a text message to Defendant stating, "Damn, that Dave dude [referring to himself, Dave Talley] is annoying. Smack him if you gotta." At trial, the expert in computer forensics who recovered the texts and other cell phone records testified that Defendant and Victim were in touch regularly: testimony consistent with Defendant's description of the two as good friends.

**{5}**   When Victim arrived at Defendant's house, he entered through an outside door that opened directly into Defendant's bedroom. Defendant testified that, even though he was expecting Victim, he was momentarily startled, and said, "Holy shit!" when Victim came in. Defendant was holding a $CO_2$ BB gun. According to Defendant, Victim jokingly asked, "What are you gonna do? Shoot me?" Defendant responded, "Maybe if I had some $CO_2$," and threw the BB gun onto his bed.

**{6}**   Victim asked Defendant's roommate, Taylor, who was in the living room, for a cigarette, which he smoked standing near the outside door to Defendant's bedroom. Defendant and Victim then went into the living room where Taylor was hanging a painting and Guinan was folding laundry. Taylor had spent part of the afternoon teaching Rankin, who had just purchased a handgun, how to load, unload, and care for the gun. Defendant testified that the gun was still in the living room that night. According to Defendant, Taylor picked up the gun, unloaded a live round, which fell to the floor, and handed the gun to Defendant. Defendant testified he was "under the impression" that Taylor had not only ejected the single bullet in the chamber, but had removed the magazine as well. Defendant testified that he and Victim continued to joke around. Defendant testified that they had joked around this way before with a gun that was not loaded. Both of them were laughing. Defendant testified that, believing the gun was not loaded, he pointed it at Victim, bounced the gun up and down in his hand, and jokingly said, "Oh now, I might shoot you." Defendant testified that he pulled the trigger, expecting a click, but got a bang.

**{7}** There was conflicting testimony about whether Taylor handed the gun to Defendant that evening, and, if he did, whether he ejected a round that evening, as described by Defendant, or whether it had been ejected earlier in the day. Taylor testified that he did not see or handle the gun that night: that Defendant walked into Rankin's room, and came out with the gun. Taylor agreed with Defendant that he had ejected a live round, but claimed that had occurred during the afternoon while he was showing Rankin how to load and unload his new gun. Taylor testified he had not retrieved the ejected round from the floor. Rankin testified that he returned the gun to his room after the afternoon session with Taylor, where he stored it under his mattress. Rankin could not remember whether Taylor had ejected a round and left it on the floor that afternoon.

**{8}** Guinan was folding laundry in the living room when Victim arrived. She was still doing that a few minutes later, just before the shooting. Guinan testified that Defendant walked behind her into Rankin's room. Shortly after that she saw a flash, her ears were ringing and David was on the floor. She did not see Defendant retrieve the gun, nor did she know whether Taylor handed the gun to Defendant. No one saw Defendant pull the trigger.

**{9}** Victim was shot in the forehead. Defendant admitted pointing the gun and pulling the trigger, but he repeatedly testified that he believed the gun was not loaded, that he was joking around, and that he did not want his friend to die.

**{10}** Defendant testified that, when he saw Victim had been shot in the head, he believed he was dead. Taylor and Guinan were scared. Taylor took the gun and put in in the backseat of Guinan's vehicle. Guinan then drove Taylor to meet his mom at "the Xerox." Taylor was not supposed to be around firearms. Guinan testified that she thought Defendant also left the house at that point, but she did not know for sure. On her way back to the house, Guinan called Defendant and they made plans to say that there had been a home invasion. Police were at the house when Guinan returned. Defendant and Guinan initially told police the home invasion story, but quickly admitted it was a lie.

**{11}** At the close of evidence the district court instructed the jury on the elements of second-degree murder pursuant to UJI 14-211 NMRA. Defendant tendered an involuntary manslaughter instruction, asking the court to instruct the jury on involuntary manslaughter as a lesser included offense of second-degree murder. Defendant argued to the district court that the evidence in the record was sufficient to allow a reasonable jury to conclude (1) that Defendant did not intend to either fire the gun or to kill Victim; and (2) that Defendant's conduct resulting in Victim's death was misdemeanor negligent use of a firearm, pursuant to NMSA 1978, Section 30-7-4(A) (1993), thereby meeting both the mens rea and conduct requirements for involuntary manslaughter, pursuant to NMSA 1978, Section 30-2-3(B) (1994). The district court denied Defendant's requested instruction, holding that the evidence adduced at trial was not sufficient to allow a reasonable jury to conclude that Victim's death resulted from Defendant's negligent use of a firearm. The district court concluded that no reasonable jury could find that

Defendant's conduct resulting in Victim's death was anything less than aggravated assault with a deadly weapon, a felony offense that ruled out involuntary manslaughter.

**{12}** The jury convicted Defendant of second-degree murder. Defendant appeals, claiming the district court erred in denying his request to instruct the jury on the elements of involuntary manslaughter.

## DISCUSSION

### Standard of Review

**{13}** "The propriety of jury instructions denied or given involves mixed questions of law and fact that we review de novo." *State v. Skippings*, 2011-NMSC-021, ¶ 10, 150 N.M. 216, 258 P.3d 1008. "When considering a defendant's requested instructions, we view the evidence in the light most favorable to the giving of the requested instructions." *Id.* (alteration, internal quotation marks, and citation omitted). "A defendant is entitled to an instruction on his or her theory of the case if evidence has been presented that is sufficient to allow reasonable minds to differ as to all elements of the offense." *Id.* (internal quotation marks, and citation omitted). An instruction should be given when there is "evidence sufficient to justify a reasonable jury determination as to whatever element is under consideration." *State v. Rudolfo*, 2008-NMSC-036, ¶ 27, 144 N.M. 305, 187 P.3d 170 (internal quotation marks and citation omitted).

**{14}** "In addition, to obtain an instruction on a lesser included offense, there must be some view of the evidence pursuant to which the lesser offense is the highest degree of crime committed, and that view must be reasonable." *Skippings*, 2011-NMSC-021, ¶ 10 (alteration, internal quotation marks, and citation omitted). "Therefore, if a jury rationally could acquit on the greater offense and convict on the lesser, the defendant is entitled to the instruction." *Id.* (internal quotation marks and citation omitted).

### I. Involuntary Manslaughter, Pursuant to Section 30-2-3

**{15}** "A crime generally consists of two elements, a physical, wrongful deed (the 'actus reus'), and a guilty mind that produces the act (the 'mens rea')." *State v. Gonzalez*, 2005-NMCA-031, ¶ 10, 137 N.M. 107, 107 P.3d 547 (internal quotation marks and citation omitted). "A defendant may be convicted of involuntary manslaughter when a convergence of the proper act and state of mind requirements result in the death of an individual." *State v. Henley*, 2010-NMSC-039, ¶ 14, 148 N.M. 359, 237 P.3d 103. Manslaughter is an unintentional killing: the defendant's conduct results in death, but the defendant did not intend the victim's death. *See id.* (noting that involuntary manslaughter includes only unintentional killings; *see also* § 30-2-3 ("Manslaughter is the unlawful killing of a human being without malice."). The mens rea required for involuntary manslaughter is criminal negligence. *See State v. Yarborough*, 1996-NMSC-068, ¶ 20, 122 N.M. 596, 930 P.2d 131 (holding that involuntary manslaughter, whether premised upon a lawful or unlawful act, requires a showing of criminal negligence). Criminal negligence exists where the defendant "acts with willful disregard of the rights or safety of others and in a manner which endangers any person or property."

*Skippings*, 2011-NMSC-021, ¶ 18 (alterations, internal quotation marks, and citation omitted); *see* UJI 14-231 NMRA (defining "criminal negligence" for purposes of involuntary manslaughter as existing where the defendant (1) was aware of the danger or risk his actions posed to the victim, and (2) acted with willful disregard for the safety of the victim).

**{16}** A defendant's conduct that results in a death must fit one of three specified courses of conduct to be defined as involuntary manslaughter: "(1) the commission of an unlawful act not amounting to a felony; (2) the commission of a lawful act that might produce death in an unlawful manner; or (3) the commission of a lawful act that might produce death without due caution and circumspection." *State v. Salazar*, 1997-NMSC-044, ¶ 54, 123 N.M. 778, 945 P.2d 996.

## II. Reasonable Minds Could Differ Regarding Whether Defendant Committed Involuntary Manslaughter by Negligent Use of a Firearm, or Second-Degree Murder by Aggravated Assault With a Deadly Weapon

**{17}** Defendant requested an instruction on involuntary manslaughter based on the first course of conduct specified in *Salazar*: that death result from the commission of "an unlawful act not amounting to a felony." *Id.* Specifically, Defendant contends on appeal that the jury could have reasonably concluded that Victim's death resulted from Defendant's commission of misdemeanor negligent use of a firearm, in violation of Section 30-7-4(A). Defendant claims Victim's death was the result of negligence and that he never intended to kill Victim. The State contends in response that the evidence shows that Defendant necessarily committed a felony—an aggravated assault with a deadly weapon, in violation of NMSA 1978, Section 30-3-2 (1963). The State argues that no one can fire a shot at someone's head at close range without intending to kill them, and that, therefore, an involuntary manslaughter instruction was properly refused by the district court.

### A. Negligent Use of a Deadly Weapon (a Misdemeanor) v. Aggravated Assault (a Felony)

**{18}** Defendant claims that he committed the misdemeanor of negligent use of a firearm in two ways:

(2)     carrying a firearm while under the influence of an intoxicant or narcotic; [and]

(3)     endangering the safety of another by handling or using a firearm . . . in a negligent manner[.]

Section 30-7-4(A)(2), (3).

**{19}** In contrast, committing an assault with a deadly weapon, as the State contends, requires an "unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery[,]" NMSA

1978, § 30-3-1(B) (1963), accomplished with the use of a deadly weapon, § 30-3-2(A). *See State v. Bachicha*, 1991-NMCA-014, ¶ 10, 111 N.M. 601, 808 P.2d 51 ("The offense of aggravated assault requires proof that [the] defendant threatened or engaged in menacing conduct with a deadly weapon toward a victim, causing the victim to believe he or she was about to be in danger of receiving an immediate battery.").

**{20}** There are two key distinctions between these crimes, one a misdemeanor and the other a felony, that are central to this case. The first is the mens rea required for conviction of each crime. The mens rea required for misdemeanor negligent use of a firearm is criminal negligence, the same mens rea required for involuntary manslaughter. Our uniform jury instructions define criminal negligence as actions undertaken with "willful disregard of the rights or safety of others and in a manner which endangered any person or property." UJI 14-133 NMRA. Involuntary manslaughter requires that the defendant "should have known of the danger involved by [his conduct]"; and that the defendant "acted with willful disregard for the safety of others[.]" UJI 14-231 NMRA.

**{21}** In contrast, the mens rea for felony aggravated assault is general criminal intent. General criminal intent in the context of aggravated assault has been defined by this Court to require "a mental state of conscious wrongdoing[,]" rather than merely engaging in an intentional act. *State v. Cruz*, 1974-NMCA-077, ¶ 9, 86 N.M. 455, 525 P.2d 382. Specific "intent to do physical harm or bodily injury" is not required." *Id.* ¶ 8 (internal quotation marks omitted). Something done as a joke, where the defendant is not conscious of any wrongdoing, may, therefore, support a jury finding that the criminal intent necessary to constitute the crime of aggravated assault is lacking. *Id.* ¶ 9; *see State v. Johnson*, 1996-NMSC-075, ¶ 8, 122 N.M. 696, 930 P.2d 1148 (agreeing with *Cruz* that "one who acts without an evil purpose but for fun or as a practical joke does not have criminal intent necessary to convict of assault").

**{22}** The second difference between negligent use of a firearm and aggravated assault with a deadly weapon focuses on the conduct required to convict. In addition to the requirement that the defendant act with general criminal intent, and in a menacing or threatening manner, aggravated assault requires both that the defendant's conduct be shown to have "caused [the victim] to believe the defendant was about to intrude on [the victim's] bodily integrity or personal safety by touching or applying force to [the victim] in a rude, insolent or angry manner," UJI 14-302(2) NMRA, and that the victim's fear be objectively reasonable. UJI 14-302(3); *see State v. Arrendondo*, 2012-NMSC-013, ¶ 14, 278 P.3d 517.

**{23}** Negligent use of a deadly weapon, on the other hand, requires evidence showing that the defendant used a firearm in a manner that any reasonable person would have considered unsafe, and that endangered the safety of another. Section 30-7-4.

**B.     A Reasonable Jury Could Acquit Defendant of Aggravated Assault and Convict Him of Negligent Use of a Deadly Weapon**

**{24}**     The question for this Court is, can reasonable minds differ based on the evidence at trial regarding whether Defendant's conduct constitutes negligent use of a firearm or aggravated assault with a deadly weapon? If it would be reasonable, under any version of the facts supported by the evidence, to acquit Defendant of aggravated assault with a deadly weapon and convict him of negligent use of a firearm, the involuntary manslaughter instruction must be given. We, therefore, next determine whether the evidence would allow a reasonable jury to acquit Defendant of aggravated assault with deadly weapon and convict him of negligent use of a firearm.

**{25}**     At trial, Defendant's description of pointing a gun at Victim's head from a few feet away would certainly support the inferences drawn by the district court: that pointing a gun at someone's head is threatening or menacing conduct, that Defendant therefore had general criminal intent, and that it is reasonable to infer that Victim was put in fear of being shot. But that is not the only reasonable understanding of the evidence here. Defendant testified that he was "joking around" with Victim, who was a close friend, in the same way the two had often joked in the past. He claimed the two had even joked with unloaded guns before, without any adverse consequences. Defendant testified that he behaved in a comic manner—he was bouncing the gun up and down in his hand; and that Victim was in on the joke: Victim was laughing along with Defendant, and showed no fear. There was no testimony contradicting Defendant's description of Victim as laughing and joining in what, according to Defendant, was intended as a joke by Defendant and perceived as a joke by Victim. *Compare State v. Gaitan*, 2002-NMSC-007, ¶¶ 8, 13, 131 N.M. 758, 42 P.3d 1207 (concluding that the defendant's conduct could not support a jury instruction on negligent use of a deadly weapon where the defendant admitted he "wanted to mess around with [the victim] a little bit[,]" so he drove up "real close" and "revved his engine," and where the defendant acknowledged that the victim "must of thought [he] was going to hit him or something").

**{26}**     Neither Taylor's nor Guinan's testimony as to either the state of mind of Victim or his demeanor just before the incident contradicted Defendant's testimony. The State concedes there was no evidence of a motive for killing Victim; no evidence of an argument; no scream or cry from Victim prior to the gunshot; no call for help; no attempt to escape. One minute Victim was smoking a cigarette in Defendant's bedroom, and the next minute he had been shot. Moreover, the evidence taken from the cell phones of both Defendant and Victim just minutes before Victim arrived at Defendant's house confirms Defendant's description of Defendant and Victim as having a running joke about Defendant "smacking" Victim.

**{27}**     The State describes this relationship as "bull[ying]" by Defendant. The State claims that Defendant purposely pulled the trigger, and, therefore, the killing of Victim cannot be seen as resulting from negligence. Although these are reasonable inferences that would support the State's view that this was an aggravated assault, resulting in a second-degree murder, in conducting our review of the district court's decision to deny the involuntary manslaughter instruction, we must "view the evidence in the light most

favorable to the giving of the requested instructions". *Skippings*, 2011-NMSC-021, ¶ 10 (alteration, internal quotation marks, and citation omitted). There is sufficient evidentiary support for Defendant's theory that his conduct did not put Victim in fear of being shot, touched, injured, or otherwise battered. Most individuals who have a gun pointed at them, even if they believe it is unloaded, would be placed in fear, yet we cannot say that it would be unreasonable for a jury to believe Defendant's version of events. "Such competing strands of evidence are for the jury to consider and resolve." *Id.* ¶ 16. If Defendant's testimony is believed, a reasonable jury could acquit Defendant of aggravated assault with a deadly weapon.

**{28}**    The State next argues that no rational jury could conclude that Defendant committed merely misdemeanor negligent use of a firearm when he pointed the gun at Victim and pulled the trigger. The district court below pointed to evidence that Defendant was familiar with guns and that he had briefly handled this gun during the afternoon while Taylor was instructing Rankin on its use, in deciding that no reasonable jury could find that Defendant did not know that the gun was loaded when he pulled the trigger. Defendant, however, testified that he assumed, based on watching the bullet in the chamber be ejected, that the magazine had been removed at the same time, and that the gun was no longer loaded. Defendant admitted that he had been using illicit drugs with one or more of his roommates that night and described himself as being under the influence at the time of the incident. We do not agree with the State that Defendant's testimony, that impaired by his admitted use of methamphetamine, he assumed the gun was unloaded and failed to check to see that the magazine had been removed before pulling the trigger, was so outlandish as to be beyond reasonable belief. Therefore, a reasonable jury could convict Defendant of negligent use of a firearm.

**{29}**    It is the role of the jury to decide between these two different offenses. Because the evidence supports more than one reasonable conclusion, the district court erred by refusing to instruct the jury on involuntary manslaughter by negligent use of a firearm.

### III.    Defendant's Proposed Involuntary Manslaughter Instruction Preserved the Issue for Review

**{30}**    The State argues that Defendant failed to tender an appropriate involuntary manslaughter instruction and, therefore, failed to preserve the issue. Defendant argues that his requested involuntary manslaughter instruction is "entirely consistent with the language UJI 14-231 . . ., which provides an accurate statement of the law with respect to involuntary manslaughter."

**{31}**    "Generally, to preserve error on a [district] court's refusal to give a tendered instruction, the [defendant] must tender a legally correct statement of the law." *State v. Jernigan*, 2006-NMSC-003, ¶ 10, 139 N.M. 1, 127 P.3d 537. "However, if the record reflects that the judge clearly understood the type of instruction the [d]efendant wanted and understood the tendered instruction needed to be modified to correctly state the law, then the issue is deemed preserved for appellate review." *Id.*

**{32}** At trial, Defendant presented the following involuntary manslaughter instruction embodying the theory that Victim's death resulted from Defendant's unlawful act not amounting to a felony:

> For you to find [D]efendant guilty of involuntary manslaughter as a lesser included offense of second[-]degree murder, the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1. [D]efendant pointed a firearm at [Victim] and pulled the trigger;
>
> 2. [D]efendant should have known of the danger involved by [D]efendant's actions;
>
> 3. Defendant acted with a willful disregard for the safety of others;
>
> 4. Defendant's act caused the death of [Victim];
>
> 5. This happened in New Mexico on or between the 18th day of December, 2016, and the 19th day of December, 2016.

**{33}** The State argues "Defendant's requested instruction for involuntary manslaughter describes an intentional aggravated assault at a minimum[,]" and therefore, Defendant failed to preserve his argument on appeal that he was entitled to an instruction on involuntary manslaughter by negligent use of a firearm. Having concluded that a jury could reasonably convict on involuntary manslaughter and acquit on second-degree murder, we disagree. "The [s]tate overlooks the purpose of the rule requiring the tender of a correct instruction, which is to alert the [district] court to the defendant's argument." *State v. Hill*, 2001-NMCA-094, ¶ 7, 131 N.M. 195, 34 P.3d 139. The district court clearly understood that Defendant was requesting an instruction on involuntary manslaughter premised on misdemeanor negligent use of a firearm. The State argues that Defendant's proposed instruction is the same as the requested instruction in *Salazar*, which our Supreme Court agreed failed to preserve for appeal the defendant's request for an involuntary manslaughter instruction. *See* 1997-NMSC-044, ¶ 56. In *Salazar*, the instruction admits the defendant was "[s]hooting at" the victim. *Id.* Defendant's instruction, in contrast, describes pointing a gun at Victim and pulling the trigger. The district court was well aware that Defendant claimed that he did not know the gun was loaded and therefore, unlike the defendant in *Salazar*, he was not intentionally "shooting at" Victim when he pulled the trigger.

**{34}** The record here shows that the attorneys and the judge discussed the issue extensively, and that the district court understood the type of instruction Defendant wanted and was, therefore, in a position to correct any misstatements contained in the proffered instruction. *See Jernigan*, 2006-NMSC-003, ¶ 10 ("[I]f the record reflects that the judge clearly understood the type of instruction the [d]efendant wanted and

understood the tendered instruction needed to be modified to correctly state the law, then the issue is deemed preserved for appellate review.").

**{35}**    The rationale underlying the preservation requirement and the requirements set by New Mexico courts for preservation were met. Therefore, the State's preservation argument fails.

**CONCLUSION**

**{36}**    Because failure to give the jury a requested instruction on a lesser included offense when the instruction is supported by the evidence is not harmless error, *see Jernigan*, 2006-NMSC-003, ¶ 21, we reverse and remand for a new trial.

**{37}    IT IS SO ORDERED.**

**JANE B. YOHALEM, Judge**

**WE CONCUR:**

**JACQUELINE R. MEDINA, Judge**

**BRIANA H. ZAMORA, Judge**